# In the United States Court of Federal Claims

No. 22-499
Filed: March 24, 2023

**JAMES DOYLE**, *et al.*,

    *Plaintiffs*,

v.

**THE UNITED STATES**,

    *Defendant*.

*Roger J. Marzulla* and *Nancie G. Marzulla*, Marzulla Law, LLC, Washington, D.C., for Plaintiffs.

*Paul G. Freeborne* and *Elizabeth McGurk*, Trial Attorneys, *Todd Kim*, Assistant Attorney General, Environment and Natural Resources Division, U.S. Department of Justice, Washington, D.C., for Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

    The Mojave desert tortoise takes 13 to 20 years to mature.[1] Plaintiff James Doyle's dispute with the United States dates back even longer, grows at a similarly slow pace, with maturity still to come.[2] Mr. Doyle alleges that in 1996 the United States deprived him of all economically beneficial use of his property when it designated his land as critical habitat for the Mojave desert tortoise under the Endangered Species Act ("ESA"). In 2016, the Court dismissed Mr. Doyle's first attempt at recovering for this alleged taking, finding that his claim was not ripe because he had not first sought a permit from the United States Fish and Wildlife Services ("FWS") exempting him from land-use prohibitions. Mr. Doyle now contends that his Fifth Amendment takings claim is ripe. The United States moves to dismiss the case for lack of subject-matter jurisdiction. It argues that the case remains unripe because Mr. Doyle only

---

[1] U.S. Dep't of the Interior, Fish & Wildlife Serv., Desert Tortoise, https://www.fws.gov/species/desert-tortoise-gopherus-agassizii (last accessed March 16, 2023).

[2] The Court refers to the two plaintiffs in this case, James Doyle and his wholly owned limited partnership, Rocky Mountain Ventures and Environmental Land Technologies, Ltd., collectively as "Mr. Doyle."

submitted an incomplete permit application and therefore FWS still has not reached a final decision on whether his exemption permit should be granted.

Because the Court finds that Mr. Doyle was required to obtain a final decision from FWS before bringing this challenge and because he still has not done so, the Court dismisses Mr. Doyle's Complaint as unripe for adjudication under RCFC 12(b)(1).

## I. Background

The Mojave desert tortoise lives in desert valleys located between 1,000–4,000 feet in elevation. U.S. Dep't of the Interior, National Park Serv., *Desert Tortoise (Gopherus agassizii)*, https://www.nps.gov/moja/learn/nature/desert-tortoise.htm (last visited March 18, 2023). The tortoises can live up to 60 or 80 years and, once mature, have few natural predators other than mankind.[3] *Id*. This tortoise is described as the largest wild reptile in the American southwest, growing up to 15 inches in length. *See* U.S. Dep't of the Interior, Bureau of Land Management, *The Threatened Desert Tortoise*, https://www.blm.gov/sites/blm.gov/files/documents /Nevada_SNDO_Desert_Tortoise_Fact_Sheet_0.pdf (last visited March 18, 2023). In an appropriate habitat, tortoise populations range from a few per square mile to 200 per square mile. *Id*. They live the bulk of their lives in underground burrows. *Id*.

> The tortoise was listed [on the ESA] because of direct losses and threats to tortoise populations and habitat. Desert tortoises are directly impacted by increased raven predation on juveniles, collection by humans, vandalism, losses on roads and to off-highway vehicle (OHV) activities, and Upper Respiratory Tract Disease (URTD). Tortoise habitat is lost directly to urbanization, agriculture, road construction, military activities, and other uses. OHV use, rights-of-way, and grazing degrade habitat. All of these activities fragment tortoise habitat, which may reduce a tortoise population below the level necessary to maintain a minimum viable population.

*Id.*

The ESA, Pub. L. No. 93-205, 87 Stat. 884 (codified at 16 U.S.C. § 1531 *et seq*.), broadly prohibits actions such as harassing, harming, collecting, or pursuing—referred to as "the take"— of any listed species. 16 U.S.C. § 1532(19), 1539 (a)(1)(B). Once species are listed as endangered under the ESA, the Act requires the Secretary of Interior ("the Secretary") to designate critical habitat areas that are "essential to the conservation of the [listed] species and . . . may require special management consideration or protection[.]" 16 U.S.C. §§ 1532(5)(A), 1533(a)(3).

The ESA requires federal agencies to ensure that any agency action "is not likely to jeopardize the continued existence" of any listed species or "result in the destruction of adverse

---

[3] Unlike adult tortoises, hatchlings are susceptible to predation from a variety of species. U.S. Dep't of the Interior, Bureau of Land Management, *The Threatened Desert Tortoise*, https://www.blm.gov/sites/blm.gov /files/documents/Nevada_SNDO_Desert_Tortoise_Fact_Sheet_0.pdf (last visited March 18, 2023).

modification of [their] habitat." 16 U.S.C. § 1536(a)(2). However, ESA's prohibitions on activities that may endanger protected species are not absolute. The ESA authorizes the FWS to permit otherwise prohibited take of listed species if FWS finds them to be "incidental to, and not the purpose of," any lawful activity. § 1539(a)(1)(B). For example, if FWS finds that lawful land-use in a protected habitat will only result in an acceptable level of loss for protected species, it issues an incidental take permit ("ITP") to allow for the land-use despite its minimal impact and given certain assurances. *Id*.

Several conditions must be met before FWS approves an incidental take permit application, one of which is that the applicant must submit a conservation plan, known as a Habitat Conservation Plan ("HCP"). § 1539(a)(2)(A); 50 C.F.R. § 17.32(b)(1)(iii)(c). By submitting an HCP, the applicant describes the impact that they believe will "likely result" from their take and explain why their proposed plan for developing their property will only have an incidental impact on the protected species. 50 C.F.R. § 17.32(b)(1)(iii)(c). FWS regulations require an HCP to describe: the intended steps to mitigate the negative impact on protected species; alternative actions to such take which were considered; the reasons why such alternatives are not being utilized; and any other measures that the Secretary may deem necessary or appropriate for purposes of the plan. *Id*. The Secretary may issue the incidental take permit that authorizes the otherwise-prohibited activity only "[u]pon receipt of a *complete* application." 50 C.F.R. § 17.32 (emphasis added).

Mr. Doyle is a real estate developer who embarked on a plan to develop 2,440 acres of property in the St. George area of Washington County, Utah, in the 1980s (located on the northern extension of the Mojave desert). (Pl.'s Resp. at 14, ECF No. 13). The City of St. George approved Mr. Doyle's design for developing a master-planned community of luxury homes anchored by nine golf courses. (Compl. at 1, ECF No.1). However, in 1990, FWS listed the Mojave desert tortoise as threatened under the ESA and by 1994 designated 129,100 acres of land in Utah (10,500 acres of which were privately owned) as critical habitat, including all of Mr. Doyle's land. *See* Endangered & Threatened Wildlife & Plants; Desert Tortoise, 54 Fed. Reg. 42270 (Oct. 13, 1989); Determination of Critical Habitat for the Mojave Population of the Desert Tortoise, 59 Fed. Reg. 5820 (Feb. 8, 1994); *see also* (Pl.'s Resp. at 13).

Subsequently, in 1996, FWS approved a 20-year incidental take permit based on an HCP submitted by Washington County. (Def.'s Mot. Ex. 3, ECF No. 8). The incidental take permit authorized Washington County to develop up to 12,264 acres of the tortoise habitat on non-Federal land in the County and all other non-Federal land in the County outside the area known as the Beaver Dam Slope. (Def.'s Mot. Ex. 4).

In 2009, Congress sought to grant additional special protection to 44,725 acres of public land within the Red Cliffs Desert Reserve by designating that portion as the Red Cliffs National Conservation Area. Omnibus Public Land Management Act of 2009, Pub. L. No. 111–11, 123 Stat. 991 (March 30, 2009). Congress's stated aim was to conserve and protect "the ecological, scenic, wildlife, recreational, cultural, historical, natural, educational, and scientific resources," of that area. *Id*. This legislation authorized the Secretary of the Interior to sell public land and use the proceeds to purchase private land that remained in the conservation area. *Id*. Mr. Doyle's lands and several other private land holdings are located among the public lands in this designated conservation area. (Pl.'s Resp. at 15).

In 2016, Washington County's incidental take permit expired, and the County obtained approval from FWS for a new HCP in 2020. (Def.'s Mot. Exs. 5,6). Pursuant to that HCP, FWS issued a new 25-year incidental take permit to the County. (*Id.*). In 2015, Mr. Doyle challenged FWS's decision to foreclose development on his land as a violation of the Fifth Amendment's takings clause. *See Doyle v. United States*, 129 Fed. Cl. 147 (2016). Mr. Doyle also claimed that the United States had obligated itself to purchase his land for fair value by approving the Washington County HCP and its failure to do so was a breach of contract. *Id*. The Court found that Mr. Doyle had failed to state a claim for breach of contract because Mr. Doyle's participation in the steering committee that worked to prepare the Washington County HCP was not enough to make Mr. Doyle a party to, or a third-party beneficiary, of the 1996 agreement that was finally approved between FWS and Washington County. *Id*. at 156. The Court also rejected the argument that the 2009 designation of Red Cliffs National Conservation Area impacted Mr. Doyle's property rights, finding that the law did "not . . . place any express restrictions on development of private lands located within its boundary." *Id*. at 158. Most relevant here, the Court dismissed Mr. Doyle's 2015 action for lack of subject-matter jurisdiction finding that Mr. Doyle's claim was unripe because he had not submitted an incidental take permit application to FWS that included his proposed development plan before bringing the lawsuit. *Id.* at 156–58.

Subsequently, Mr. Doyle submitted his permit application to FWS in March 2020. (Def.'s Mot. Ex. 1). This time, the application did not include a personalized HCP, and FWS notified Mr. Doyle in June 2020 that the application was incomplete for that reason. (Pl.'s Resp. at 26). To date, Mr. Doyle still has not amended his application with a proposed HCP, instead insisting that the application incorporates Washington County's previous HCP. (*Id.*)

## II. Discussion

Mr. Doyle filed his Complaint on May 6, 2022, claiming that the takings claim is now ripe because FWS has effectively denied his application by failing to act. (*See* Compl.). Mr. Doyle also argues that two decisions issued by the Supreme Court in the aftermath of his initial lawsuit introduce new standards that now render Mr. Doyle's takings claim ripe for adjudication.

Before proceeding to the merits, the Court must determine that it has subject-matter jurisdiction. *Steel Co. v. Citizens for a Better Envt*, 523 U.S. 83, 88–89 (1998). The plaintiff bears the burden of proving that subject-matter jurisdiction exists. *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 182–83 (1936). This Court has subject-matter jurisdiction over timely takings claims pursuant to the Fifth Amendment of the U.S. Constitution and the Tucker Act. U.S. Const. amend. V; 28 U.S.C. § 1491(a)(1). The Court does not have jurisdiction over claims that are not ripe. *See Howard W. Heck & Assocs., Inc. v. United States*, 134 F.3d 1468 (Fed. Cir. 1998).

As the Court previously stated, federal courts have jurisdiction to review takings claims related to ESA's enforcement but the path to the Courts is marked by two requirements: (1) that the plaintiff applies for an incidental take permit with FWS and (2) that the application includes an HCP for FWS's consideration and final approval. *See Doyle*, 129 Fed. Cl. at 156 (noting that "even where a plaintiff has been enjoined by a court from conducting an activity on its property because of the ESA, the Federal Circuit has required that the plaintiff seek an [ITP]," before the case is ripe) (citing *Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1348 (Fed. Cir.

4

2002)); *see also Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.*, 148 F.3d 1231, 1238 (11th Cir. 1998) ("a prerequisite to receiving an incidental take permit, [is for] the applicant [to] submit a habitat conservation plan."). The purpose of this process is to first give FWS the chance to balance the interests at stake and reach a final decision on whether its regulatory enforcement obligations overcome the particular property interest at stake. *See Schooner Harbor Ventures, Inc. v. United States*, 569 F.3d 1359, 1365 (Fed. Cir. 2009) ("[A] claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.") (quoting *Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank*, 473 U.S. 172, 186 (1985), *rev'd on other grounds by Knick v. Twp. of Scott*, 139 S. Ct. 2162 (2019)).

Mr. Doyle, however, argues that two recent Supreme Court decisions—*Knick*, 139 S. Ct. 2162 (2019) and *Pakdel v. City & Cnty. of S.F.*, 141 S. Ct. 2226 (2021)—change the requirements for when FWS regulations can be challenged in federal courts. (Pl.'s Resp. at 27–28). In both *Pakdel* and *Knick,* the Supreme Court reconsidered the scope of its prior decision in *Williamson*, 473 U.S. 172 (1985). In *Williamson,* property owners challenged the application of a local zoning ordinance and the land-use restrictions it imposed as a temporary taking. 473 U.S. at 175. The Court in *Williamson* introduced two ripeness requirements for federal courts' review of certain takings claims: first, that the property owner obtains a final decision from the government entity in charge of enforcing the regulation (known as the finality requirement), and second, that the property owner first seeks just compensation under state law in state court before bringing a taking claims in federal courts (known as the state-litigation requirement). *See Knick*, 139 S. Ct. at 2167–69 (summarizing the holding in *Williamson*).

In 2019, thirty-four years following *Williamson*, the Supreme Court revisited its earlier reasoning in the context of another local land-use ordinance. *Knick*, 139 S. Ct. at 2162. *Knick* found that *Williamson's* state-litigation requirement "imposes an unjustifiable burden on takings plaintiffs," who in many cases had to navigate conflicting jurisdictional rules to ensure their claims could ever be heard in federal courts. *Id.* at 2167–69. Acknowledging the "unanticipated consequences" of *Williamson's* state-litigation requirement, the Supreme Court overruled that decision in part. *Id.* at 2178–9 ("The state-litigation requirement of *Williamson* is overruled."). The Supreme Court in *Knick* explicitly stated that *Williamson's* finality requirement was not under review and therefore not disturbed. *See id.* at 2169 ("Knick does not question the validity of [*Williamson's*] finality requirement, which is not at issue here."). Thus, *Knick* does not retroactively affect what this Court held in 2016, nor does it ripen Mr. Doyle's claim.

Two years after *Knick*, in *Pakdel*, the Supreme Court expounded on *Williamson* again, this time addressing the state-forum finality requirement. *Pakdel*, 141 S. Ct. at 2228–29. In *Pakdel*, the City of San Francisco had twice denied the property owners' request to be exempted from a land-use ordinance. *Id.* Yet, the Ninth Circuit found that *Williamson's* finality requirement barred the property owners from suing because the property owners' delays in seeking an exemption from the government entity denied the state agency the "opportunity to exercise its 'flexibility or discretion'" to reach a final decision. *Id.* Although the Ninth Circuit compared *Williamson's* requirement for exhaustion of state remedies to the administrative-exhaustion doctrine, the Supreme Court rejected that analogy. *Id.* at 2231.

5

The Supreme Court noted that, unlike the administrative-exhaustion doctrine which requires "*proper* exhaustion," meaning compliance with *all* agency requirements and "critical procedural rules," *Williamson* only mandates a "relatively modest" finality requirement. *Id.* at 2230 (emphasis added). Under this modest rule of finality, the property owners only need to show that "there is no question about the [the government entity's] position," on how the regulation at issue applies to their property. In other words, *Williamson's* finality requirement is met so long as it is clear to the federal courts that the initial decisionmaker has arrived "at a definitive position" on the issue, even if certain additional levels of administrative review remain unexhausted, and even if certain "administrative missteps" occurred on the way to obtaining that final decision. *Id.* at 2231. Together, *Knick* and *Pakdel* imply that federal courts can review takings claims once it is clear that the government entity has "firmly rejected [the property owners'] request for a property-law exemption." *See id.* at 2226 (finding that *Williamson* did not require the petitioners to show that they had also complied with agency's administrative procedures for seeking relief when they had shown that the City "had firmly rejected their request for property-law exemption").

Mr. Doyle is correct that *Knick* states, in part, that "contrary to [*Williamson*], a property owner has a claim for a violation of the Taking Clause as soon as a government takes his property for public use without paying for it." *Knick*, 139 S. Ct. at 2170 ("[t]he Fifth Amendment right to full compensation arises at the time of the taking . . .'") (citing *Jacobs v. United States*, 290 U.S. 13 (1933)). But the Supreme Court did not offer that statement in a vacuum, and neither will this Court interpret it in a vacuum. Although *Knick* states that property owners may challenge government action as soon as their property has been taken, it does not define the moment of taking as the moment when the property owner subjectively feels affected by a potential taking. Instead, the Supreme Court cited *United States v. Dow*, 357 U.S. 17, 22 (1958), for the proposition that "the act of taking" remains the "event which gives rise to the claim for compensation." *Knick*, 139 S. Ct. at 2170. *Dow* itself held that the event that constitutes "the act of taking" is either when the government entity has physically entered and taken possession of the property, or when it has filed a declaration of taking for the property in question. *Dow*, 357 U.S. at 23. In either case, such actions render the property owner's takings claim ripe because they reflect "a definitive position" by the government entity that it will interfere with the property owner's intended use. *Knick* did not disturb the test the federal courts have used for centuries to determine the moment of taking; it merely clarified that after "the act of taking," the property owners are no longer obligated to avail themselves of all "procedures the government puts in place to remedy [that] taking," (by way of providing just compensation) before seeking that remedy directly—and likely more expeditiously—in the federal courts. *Knick*, 139 S. Ct. at 2170.

Mr. Doyle's case is discernibly different from that of the property owners in *Pakdel* and *Knick*. In *Knick*, the city had already issued violation notices against the property owner for violating the local ordinance. *Id.* at 2164–65. Similarly, in *Pakdel*, the City had already twice denied the property owners' request for exemption. *Pakdel*, 141 S. Ct. at 2229. Therefore, in both *Pakdel* and *Knick*, there was no dispute that the government entity in question had reached a definitive position that the property owners were not exempted from the regulation. Conversely, FWS has never issued *any* decisions on how the existing regulations should apply to Mr. Doyle's specific proposed development. (Pl.'s Resp. at 35). And without the required HCP, as the Court noted in 2016, the FWS will not issue a decision. *See Doyle*, 129 Fed. Cl. at 156–158.

6

In addition, both *Pakdel* and *Knick* involved analyzing the ripeness requirement for actions brought under 42 U.S.C. § 1983, and the Supreme Court in both cases acknowledged that the ripeness analysis might differ in each case because Congress has the power to subject claims filed under other statutes to stricter finality requirements. *See Pakdel*, 141 S. Ct. at 2231.[4] ("Congress always has the option of imposing a strict administrative exhaustion requirement— just as it has done for certain civil-rights claims filed by prisoners.").[5] Unlike Section 1983 which does not anticipate an administrative review process, the ESA includes Congress's clear guidance on how and when FWS reaches a "conclusive position" on how the ESA's restrictions should apply to a particular land. As noted, 50 C.F.R. § 17.32(b)(1)(iii)(c) requires permit applicants to submit an HCP that, among other things, details the sufficient protection and mitigation measures they believe they can take to minimize the impact of their proposed development on protected species. Critically, this process also involves notice and an opportunity for public comment. 6 U.S.C. § 1539(a)(2)(A); *see also* 16 U.S.C. § 1539(c); 50 C.F.R. Parts 13 and 17. The process anticipated by Congress allows for both FWS and the public to review and balance the competing concerns of critical habitat protection and property development and reach a final determination.

As the Supreme Court noted in *Pakdel*, *Williamson's* finality requirement is "relatively modest," and is aimed at ensuring that property owners are not "prematurely suing over a hypothetical harm." *Pakdel*, 141 S. Ct. at 2230; *see also Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (finding that ripeness prevents the courts from "entangling themselves in abstract disagreements over administrative policies," and protect the agencies from judicial interference "until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."). Mr. Doyle's response to the motion to dismiss is rife with contentions that neither FWS nor the public have had the chance to address. For example, Mr. Doyle claims that the tortoise population is "continuing to decline," and that the critical habitat in the area has been "significantly fragmented and reduced," by other construction and a series of wildfires. (*See* Pl.'s Resp. at 20). He asserts that, despite rigorous land-use restrictions, FWS's efforts to enhance the population of the Reserve "have been largely unsuccessful," and he expresses dissatisfaction that the United States has not "identif[ied] where or how Doyle could mitigate for any habitat disturbances that would result from his development . . . ." (*Id*. at 9). Even if true, and these claims may be, 50 C.F.R. § 17.32(b)(1) provides the mechanism for obtaining both parties' positions on these issues and any evidence supporting their position, taking the case out of the realm of abstract disagreements. As the Supreme Court held in *Pakdel* the purpose of the finality requirement is to understand how far the regulation actually goes when the property owners are claiming that it could be going too far; to answer that question the

---

[4] 42 U.S.C. § 1983 allows individuals to sue state government employees and others acting "under the color of state law" in the federal courts for civil rights violations.

[5] The Court has not identified any cases, nor has Mr. Doyle relied on any, where the standard introduced in *Pakdel* has been applied outside the context of Section 1983 actions brought to challenge exhaustion of *state* remedies such as those set up by local zoning ordinances. The absence of caselaw indicating that *Pakdel* supports full circumvention of *federal* administrative remedies required by Congress, such as a permitting process, further cautions against adopting Mr. Doyle's broad reading of *Pakdel*.

Court must first know that the government entity is "committed to" enforcing the regulation in the manner that is under challenge. *Pakdel*, 141 S. Ct. at 2230. Mr. Doyle's blanket assertion that "there is no genuine question as to whether Doyle will be allowed to develop his land," cannot substitute for the Agency's own explanation. *See Morris v. United States*, 392 F.3d 1372, 1376 (Fed. Cir. 2004) ("Evaluating whether the regulations effect a taking requires knowing to a reasonable degree of certainty what limitations the agency will, pursuant to regulations, place on the property.").

The Court also rejects Mr. Doyle's argument that "actively participat[ing]" in creating and submitting Washington County's ITP and HCP, in lieu of submitting a personalized permit application, places him in the same legal position as someone who has had his permit application denied. (Pl.'s Resp. at 35). Mr. Doyle provides no legal support for such a conclusion. Indeed, the Court rejected this very argument in 2016, and Mr. Doyle elected not to appeal the Court's conclusion. *Doyle*, 129 Fed. Cl. at 155. The United States, on the other hand, as it did in 2016, correctly argues that the Washington County ITP was signed by representatives of Washington County, the State of Utah, the Town of Ivins, Bureau of Land Management, and FWS. (Def.'s Mot. at 10). Furthermore, the United States notes that the ITP application in this case explicitly states that "[n]o persons who are not parties or participating Cities are intended to be deemed third Party beneficiaries under [the] Agreement," and that the approved ITP "will have no legal effect on [private] property [nor] place [any] restrictions on the use of [private] property within the [r]eserve." (Def.'s Mot. Ex. 3, at 6, 25–26; Ex. 2 at 22).

The requirement for first obtaining a final agency decision does not condemn potential plaintiffs to endure years of inertia and gridlock before obtaining judicial relief; the Circuit has adopted and adhered to the standard that "an extraordinary delay in the permitting process" can always give rise to a compensable taking. *See Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1349 (Fed. Cir. 2002). But in this case, FWS never received a full ITP application from Mr. Doyle to begin its review process. Rather, Mr. Doyle's direct communications with FWS throughout the prolonged period of his dispute have been focused on negotiating (with limited success) the sale or exchange of his property, a process independent and separate from seeking a regulatory exemption. (*See* Pl.'s Resp. at 9 (noting that "over the last 25 years, the Bureau of Land Management has purchased much of the land within the tortoise reserve," and that "[o]ver the years, [Mr. Doyle] has engaged in repeated and extended unsuccessful negotiations with the Government in an effort to sell or exchange his remaining property.")); *see also*, *Doyle*, 129 Fed. Cl. at 157 ("The plaintiffs' decision to voluntarily forbear from seeking to develop their land during the negotiation period," to negotiate a sale "did not give rise to a taking.").

In his response, Mr. Doyle alludes to the book *Catch-22* to describe the predicament he finds himself in.[6] (Pl.'s Resp. at 37). Mr. Doyle chides the "absurd bureaucratic constraints" surrounding his lengthy negotiations with the United States to sell his land and describes the alternative route of seeking a permit exemption as laborious and costly. (*Id.*). Indeed, nothing in the Court's opinion suggests that ESA plaintiffs are required to exhaust all just compensation negotiations with the United States before seeking their remedy at the United States Court of

---

[6] Joseph Heller, *Catch-22* 375 (Simon & Schuster 1999) (1961).

Federal Claims. The Court merely reiterates what it has said before: that the plaintiff must first obtain FWS's conclusive and definitive position on the regulation's application to their land before proceeding in the Court. *Pakdel*, 141 S. Ct. at 2230 ("The rationales for the finality requirement underscore that nothing more than de facto finality is necessary.") (quoting *Horne v. Dep't of Agric.*, 569 U.S. 513, 525 (2013)). In this case, de facto finality entailed submitting an ITP accompanied by an HCP, and not merely "participat[ing] in one HCP process," submitted by another applicant and only binding on that party. In the last 25 years or so in which Mr. Doyle has actively pursued development of his land, he never complied with this—one and only—prerequisite for challenging the United States' position.

Instead of simply resting his claim on a duly filed—and presumably denied—ITP application in his own name, Mr. Doyle again argues that his claim is supported on the back of Washington County's 1992 ITP application, which is supported by Washington County's 1992 HCP, which was supported by Mr. Doyle's input as a member of the steering committee for drafting it, and that input itself was informed by a result "that [is] already known" from the face of the law and its regulations: that Mr. Doyle cannot construct residential housing in the most environmentally sensitive area for tortoise habitat protection. (Pl.'s Resp. at 22 (claiming that "the listing of the tortoise in 1990 immediately" constituted a taking)). In other words, Mr. Doyle's resurrected as-applied challenge is a facial challenge in disguise. *See Brubaker Amusement Co. v. United States*, 304 F.3d 1349, 1356 (Fed. Cir. 2002) ("[P]laintiffs pursuing a facial challenge must show that the provision is unconstitutional in all its applications, [while] plaintiffs pursuing an as-applied challenge must show that the provision was applied to them in such a way that deprived them of their property."). Mr. Doyle requests that the Court takes his word on how the regulations in this case will apply to his specific plan and not to be concerned with the details. This approach effectively invites the Court to peer all the way down to FWS's original determination in 1994 and to examine the legality of the Agency's original decision to protect the tortoise population at all, but the Court cannot endorse Mr. Doyle's "turtles all the way down" theory of the case.[7]

### III.   Conclusion

For the stated reasons, the Court **GRANTS** the United States' Motion to Dismiss, (ECF No. 8), and dismisses this case under RCFC 12(b)(1). Plaintiff's motion for a status conference, (ECF No. 16), is **DENIED AS MOOT**. The Clerk is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

s/    David A. Tapp
DAVID A. TAPP, Judge

---

[7] The old tale involves an Eastern guru who proclaimed that the earth is supported on the back of a tiger. When the Guru's inquisitive pupils asked what then supported the tiger, the guru said it stands on an elephant; and when asked what supported the elephant, he said it is a giant turtle. When asked, finally, what supported the giant turtle, briefly taken aback, the guru responded 'Ah, . . . after that it is turtles all the way down." *See e.g.*, Geertz, Thick Description: Toward an Interpretive Theory of Culture, in The Interpretation of Cultures 28-29 (1973).